# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN LOCKE, | : | |
| Plaintiff | : | Case No. |
| v. | : | |
| | : | |
| NORTH CAROLINA STATE UNIVERSITY; | : | |
| WILLIAM R. WOODSON, in his official | : | |
| capacity; DEBORAH A. YOW, in her official | : | |
| capacity; LESTER S. CLINKSCALES, in his | : | |
| official capacity; and ROBERT M. MURPHY, | : | |
| JR., in his official and individual capacities, | : | |
| Defendants. | : | Electronically Filed |

## COMPLAINT

This case illuminates a dark corner of a university athletic department where student-athletes were abused and taken advantage of by a sexual predator in their midst, the proverbial wolf in sheep's clothing. It casts a spotlight on those who had a duty of reasonable care to protect student-athletes but who ignored the warning signs or looked away. This is far from a unique story in the college athletics landscape. Learning that a major university *yet again* allowed a sexual predator to prey on student-athletes is *yet again* alarming and horrifying. It is also *yet again* unlawful. And in this instance it caused Plaintiff Benjamin Locke substantial harm and damages.

1

Defendants North Carolina State University ("NCSU"), Woodson, Yow, Clinkscales, and Murphy unlawfully discriminated against Plaintiff Benjamin Locke on the basis of sex, to his significant personal, educational and athletic detriment.

Plaintiff Benjamin Locke, by and through his attorney, based upon knowledge of his own acts and upon information and belief as to the acts of others, respectfully alleges as follows:

## JURISDICTION AND VENUE

1. Locke brings this action to seek redress for discrimination based on gender and/or sex by the Defendants, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (1972). Accordingly, Locke invokes this Court's federal question jurisdiction conferred by 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

2. Locke brings this civil action as a legal resident and citizen of Tennessee suing a North Carolina post-secondary education entity and asserts a claim of damages that exceeds $75,000. Accordingly, Locke also invokes this Court's diversity jurisdiction conferred by 28 U.S.C. § 1332, which gives district courts original jurisdiction over all civil actions where the matter in controversy

involves a claim of damages that exceeds the sum or value of $75,000.00 and is between citizens of different States.

3.      Because this Court has jurisdiction to address the controversy before it, 28 U.S.C. § 2201 grants the Court authority to declare the rights of the parties before it, and 28 U.S.C. § 2202 authorizes the Court to grant such further relief, including injunctive relief, as the Court may deem necessary and proper.

4.      Plaintiff also states causes of action under the laws of the State of North Carolina because the Defendants have violated rights secured thereunder. Locke's state claims include invasion of privacy (offensive intrusion), negligent training and supervision, civil battery, negligence, and gross negligence. Those causes of action are so related to the federal claims in this case, over which this Court has original jurisdiction, that they form a part of the same case or controversy under Article III of the United States Constitution. Accordingly, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

5.      Defendant NCSU is a state-run public constituent of the University of North Carolina, organized and operating primarily in Wake County, North Carolina.

6.      Defendant Woodson is a resident of Wake County, North Carolina.

7.      Defendant Yow is a resident of Wake County, North Carolina.

8.      Defendant Clinkscales is a resident of Vigo County, Indiana.

9.     Defendant Murphy is a resident of Wake County, North Carolina.

10.    Plaintiff Locke is a resident of Davidson County, Tennessee.

11.    Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial portion of the events, acts, or omissions giving rise to Locke's action occurred in Wake County, North Carolina.


**PARTIES**

12.    Plaintiff Benjamin Locke is a 2018 graduate of Lipscomb University in Nashville, Tennessee. Prior to transferring to Lipscomb in the fall of 2017, Locke was a student-athlete at NCSU. Locke had been awarded an NCSU athletic scholarship as a member of the Men's Soccer team. Locke arrived on the NCSU campus in January 2015, an early high school graduate and, at just 17 years old, the youngest member of the men's soccer team. At all relevant times herein, Locke was enrolled as an NCSU student and participating in the men's soccer program.

13.    Defendant NCSU is the largest campus in the University of North Carolina System's 16-campus state-run public university system, and is located in Raleigh, Wake County, North Carolina.

14.    Defendant William R. Woodson is and was at all relevant times herein NCSU's Chancellor. Woodson's duties include oversight of all educational, research

and engagement missions of the University. Woodson leads the Chancellor's Cabinet, NCSU's senior leadership team.

15.    Defendant Deborah A. Yow was the NCSU Athletic Director from 2011 to 2019 and was the Athletic Director reporting to the Chancellor at all relevant times herein. Yow's duties as Athletic Director included administrative oversight of all NCSU athletes, athletics department staff, and NCAA Division I team sports activities and compliance. As a Director, Yow was designated as an NCSU responsible employee[1] and as the Athletic Director was a member of the Chancellor's Cabinet.

16.    Defendant Sherard Clinkscales was hired by NCSU in 2011 as an Associate Athletic Director, was promoted to Senior Associate Athletic Director for Student Services and Sport Administration in 2012 and was at all relevant times herein an NCSU Senior Associate Athletic Director, reporting to Athletic Director Yow. As a Director, Clinkscales was designated as an NCSU responsible employee.

17.    Defendant Robert M. Murphy, Jr. was at all relevant times herein NCSU's Director for Sports Medicine, an Assistant or Associate Athletic Director

---

[1]    NCSU "responsible employees" are those who have a duty to report incidents of sex discrimination to the Title IX Coordinator or other appropriate school designee. This includes members of the Athletic Department who are Directors, Coaches and Trainers.

reporting to Yow and/or Clinkscales, and the designated athletic trainer for the Men's Soccer team. As a Director, Murphy was designated as an NCSU responsible employee.

## APPLICABLE LAW AND POLICY

18.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

19.     Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

20.     "Title IX contains an implied private right of action permitting aggrieved parties to sue educational institutions for alleged violations." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 713 (1979)." *Davis v. Univ. of N.C. at Greensboro* (M.D.N.C. 2020).

21.     "Title IX, in conjunction with 42 U.S.C. § 2000d-7(a)(1), represents Congress' expression of a 'clear, unambiguous, and unequivocal condition of waiver of Eleventh Amendment immunity.' *Litman v. George Mason University*, 186 F.3d

6

544. Thus, by accepting federal funding under Title IX, a state agrees to waive its Eleventh Amendment immunity. (*Id*.). *Kirby v. N.C. State Univ*. (E.D. N.C. 2015).

22.     "The Supreme Court has held that sexual harassment, including coerced sexual intercourse, is sex-based discrimination. See *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 63, 74-75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (finding that a teacher's repeated rape of a student on school property supported a Title IX claim, noting that sexual harassment is based on the victim's sex and thus constitutes sex-based discrimination)." *McClean v. Duke Univ*., 376 F.Supp.3d 585 (M.D. N.C. 2019).

23.     North Carolina's three-year statute of limitations generally governs a Plaintiff's claims under Title IX. However, North Carolina's 2019 Safe Child Act (S.L. 2019-245), established a statute of limitations under N.C. Gen. Stat. § 1-17(d) for a plaintiff to "file a civil action against a defendant for claims related to sexual abuse suffered while the plaintiff was under 18 years of age until the plaintiff attains 28 years of age."

24.     Federal law determines when Locke's federal law claims accrued. Discrimination claims accrue "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing

*United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

25.     All paragraphs of this pleading are incorporated herein by reference.

26.     Benjamin Locke was an elite soccer player from Cincinnati, Ohio who went to high school and played on the men's soccer teams at Charlotte Soccer Academy in Charlotte, North Carolina.

27.     Locke's date of birth is 1997. Locke was under the age of 18 throughout the spring semester of 2015 when the conduct complained of herein began. As of the date of this filing, Locke is not yet 28 years of age.

28.     In 2014, Locke was recruited by NCSU's Head Coach Kelly Findley to play for the NCSU Men's Soccer team and was awarded an athletic scholarship to do so.

29.     Locke arrived at NCSU on or about January 4, 2015 and moved into an apartment with three roommates in the building designated for athletes near the athletic facilities.

30.     Locke and/or one of his parents executed and submitted the NCSU Athletic Department paperwork required of incoming student-athletes to participate

in NCSU athletics, including the "Shared Responsibility and Assumption of Risk" form on which Locke agreed with the express premise that it was the athlete's responsibility to "comply with [the] directions" of the coaches and Sports Medicine staff.

31.     Defendant Clinkscales' Senior Associate Athletic Director duties included oversight to multiple administrative units and sports, including strength and conditioning, sports medicine, nutrition, housing, and student services. Clinkscales chaired the 2011 search committee for a new Director of Sports Medicine, a position filled in December 2011 by Defendant Murphy.

32.     Murphy was previously employed as an athletic trainer at Mercer University in Macon, Georgia and began his employment as NCSU's Director of Sports Medicine on January 4, 2012.

33.     Murphy's duties at NCSU were to provide direct oversight and coordination of day-to-day athletic training, medical services operations, and sports medicine facility management for NCSU's 23 NCAA Division I teams and approximately 550 student-athletes.

34.     Murphy was licensed by the North Carolina Board of Athletic Trainers Examiners[2] ("NCBATE") on December 14, 2011 and submitted the required "Licensed Athletic Trainer Protocol" outlining his athletic trainer responsibilities and authorized duties, naming NCSU as his Team/Organization, and providing the name and signature of the NCSU team physician who ostensibly had oversight of Murphy's work as a licensed athletic trainer.

**January through May 2015**

35.     In January 2015, Locke experienced recurrent anterior shin pain and reported his condition to Murphy within days of his arrival at NCSU.

36.     Murphy attempted to remedy Locke's shin pain with new shoes, orthotics, moist heat pack thermotherapy, active stretching, directions for self-myofascial release, foam rollers, and massage therapy.

---

[2] The North Carolina Board of Athletic Trainer Examiners is statutorily created and delegated with the authority to regulate the profession of athletic training in the interest of protecting the health, safety, and welfare of the public. With necessary oversight by the government, the Board enforces standards and criteria set forth in statute and adds specificity through the promulgation of regulations.

37.    As the designated team trainer for Men's Soccer, Murphy was fully in control of determining when and whether Locke was allowed to play based on his assessment of Locke's injuries, health and need for further treatment.

38.    When the other interventions failed, Locke was seen by a team physician and diagnosed with bilateral compartment syndrome on February 6, 2015 and was scheduled for surgery at Rex Hospital in Raleigh on March 28, 2015.

39.    Locke's parents and Murphy were present at Rex Hospital during his surgical procedure on March 28, 2015.

40.    After Locke was discharged, his parents took him to their hotel as he recuperated from the effects of the anesthesia and kept his legs elevated. They drove him back to his campus apartment on Sunday, March 29, 2015.

41.    On Sunday afternoon, Murphy texted Locke that he was concerned about possible infection at Locke's surgery incisions if they became wet while bathing.

42.    Murphy texted Locke that he would take care of him, wrap up his bandages, make sure they didn't get wet, and help Locke shower at Weisiger-Brown.[3]"

_____

[3]    NCSU's Weisiger-Brown Athletic Facility ("WBAF") housed the men's and women's locker rooms and shower facilities, the Sports Medicine

43.     Murphy also texted Locke that they would make sure he could shower, and that Murphy would manage the safety precautions.

44.     Locke's post-operative instructions from the hospital directed him to keep his legs elevated and to keep the surgical dressings on his two 4" shin incisions clean and dry.

45.     Murphy did not tell Locke why taking a shower was essential or even needed only 24 hours after surgery.

46.     On Sunday afternoon, using crutches prescribed by his surgeon, Locke was not able to put his full body weight on either leg.

47.     On Sunday afternoon, Locke was aware that he was physically and mentally compromised by his prescription pain medication, surgical incision pain, and mobility constraints. Locke was aware that he was too disoriented to make decisions regarding his own safety. Locke trusted Murphy was acting in his best interests and complied with his directions.

48.     Murphy arrived at Locke's apartment building, helped Locke walk gingerly to his car putting most of his weight on his crutches, got him seated in Murphy's personal vehicle, and drove him to WBAF. Murphy helped Locke hop

Department and offices, and the Athletic Training Room used by both male and female student-athletes.

into the athletic training room using his crutches. All of this movement caused Locke substantial physical pain.

49.     Locke's parents met Locke and Murphy in the athletic training room at WBAF.

50.     Murphy helped Locke up on a training table and wrapped both of Locke's calves. Murphy's face was sometimes within one to two feet of Locke's groin.

51.     Murphy told Locke's parents they could go home and told them he would take care of Locke.

52.     Locke used his crutches to get to the secure coded door into the men's locker area. Murphy unlocked and held the door open for Locke. Inside the locker room, Murphy physically assisted Locke with removing his workout pants, underwear, shirt and workout jacket. Murphy followed Locke into the open men's communal shower where Locke used his crutches to get to the accessible shower stall and sat on the fold-down seat to shower.

53.     While alone in the men's shower area with Murphy, Locke was aware that he was still physically and mentally compromised in his post-surgical state and disoriented from the prescription pain medication he had taken.

54. Although Locke was seated in the shower stall and in no danger of falling, Murphy watched him shower standing no more than five feet away. Murphy did not ask Locke if he needed him to stay and observe his shower. Locke did not feel as if he could question Murphy or object to his presence.

**August 2015 through May 2017**

55. Beginning in August 2015, Locke experienced pain in his groin and reported it to Murphy. Locke's groin pain persisted for 14 months without diagnosis despite almost daily targeted treatment by Murphy.

56. Murphy attempted to remedy Locke's groin pain with moist heat pack thermotherapy, active stretching, cryotherapy with ice, electric stimulation, wraps, deep tissue massage and sports massage.

57. Due to his persistent groin pain, Locke was "red-shirted" in order to preserve his year of NCAA eligibility and did not play in any regular season games during the 2015 soccer season. Locke continued to work out and practice as a team member.

58. On December 11, 2015, the final day of exams when most student-athletes had already left campus, Murphy unexpectedly told Locke to come in to

WBAF for a prostate exam. Murphy told Locke it was "just something we have to do." Locke did not feel as if he could question Murphy.

59.   Medical records reflect that Murphy told the doctor performing the exam that Locke had been "evaluated by an orthopedic surgeon and [sic] was felt that [Locke's groin pain] may not be musculoskeletal in nature and wanted to be checked for other sources of pain such as prostatitis."

60.   Locke's medical records show no record of an exam or evaluation of Locke's groin pain by an orthopedic surgeon prior to December 11, 2015. There is no record of a recommendation from any doctor for Locke to get a prostate exam.

61.   Locke's medical records reflect that the doctor who performed the exam noted no symptoms to justify performing a prostate exam on Locke. He also noted it was uncommon to do a prostate exam at Locke's young age in the absence of any relevant symptoms or a notable history of concern.

62.   Murphy remained in the exam room, stood by Locke's feet, and watched the doctor perform the digital rectal exam on Locke. Murphy did not ask Locke if he should stay in the room. Locke was uncomfortable with Murphy's presence in the room during the exam but did not feel that he could question it or object.

63.   Locke's prostate exam showed no signs of physical anomaly.

64.    Between August of 2015 and May of 2017, Murphy worked on Locke's groin, adductor muscles, hamstrings, and hip flexors by performing sports massages, deep tissue massages, and assisted stretching, and by applying athletic wraps to his groin, torso, and thighs before practices. During those treatment sessions:

a.  Murphy often had Locke come into his private office, WBAF Room 2182 in the athletic training area, for wrapping, examinations and treatments;

b.  Murphy's office door and the blinds on the windows looking out over the training room were closed;

c.  Murphy directed Locke to remove his loose-fitting soccer shorts and his compression shorts or underwear. Murphy watched Locke as he undressed;

d.  Murphy told Locke he had to remove his soccer and compression shorts so Murphy could access Locke's groin area to work on it;

e.  Murphy made skin-to-skin contact by touching, rubbing, holding, moving, cupping, and "flicking" Locke's penis and testicles with his bare hands or fingers, without asking for or receiving Locke's consent, and without any legitimate medical reason.

65.    In August 2016, a year after it began, Locke's groin pain persisted despite almost daily treatment from Murphy. Locke was again red-shirted for the soccer season to preserve his year of NCAA eligibility.

66.    Fourteen months after he first reported his groin pain to Murphy, Locke was finally examined by a team doctor, had an MRI, was immediately diagnosed with a sports hernia, and was scheduled for repair surgery on October 17, 2016.

67.    A six-week trial of rehabilitation is considered to be conservative treatment before resorting to sports hernia surgery. Standard practice at NCSU was to refer a student-athlete with groin pain to a specialist after one to two weeks.

68.    The 14-month delay in diagnosing Locke's sports hernia while Murphy treated Locke's groin pain with massage therapy needlessly kept Locke from playing soccer, extended Locke's physical pain, exacerbated Locke's muscle damage, and unnecessarily increased the complexity of the surgery. It also allowed Murphy months of daily opportunities to further abuse Locke.

69.    Locke's sports hernia surgery left him with a 5" scar low on his abdomen just above his genitals. After the surgery, Locke received almost daily massages to the scar area and his groin from Murphy. During those treatments:

a.  Locke's massage treatments were done by Murphy in the athletic training room, often with other student-athletes, trainers, and coaches present.

b.  Murphy told Locke not to wear underwear for the massage treatments so Murphy could access his scar and groin area;

c.  Murphy treated Locke by putting one of his arms through the waistband of Locke's soccer shorts and the other arm up through the leg of the shorts to access his scar and groin area;

d.  Locke believed his genitals were often visible to other student-athletes, trainers, and coaches in the athletic training room when Murphy gave him massage treatments;

e.  Murphy made skin-to-skin contact by touching, rubbing, holding, moving, cupping, and/or "flicking" Locke's penis and testicles with his bare hands or fingers, without asking for or receiving Locke's consent, and without any legitimate medical reason;

f.  Murphy's massage treatments caused Locke to experience such extraordinary pain that he often had to bite down on a towel, and the massage treatments often left Locke with bruises;

g. Locke did not feel he could question or object to Murphy's treatments; and

h. Murphy often leaned over or on Locke, so Murphy's hips, arms, wrists, and legs were touching or leaning on Locke's genitals.

70.    Murphy regularly applied wraps on Locke's groin for practices. To apply them, Murphy told Locke to remove his compression shorts in his office and then kneeled down in front of Locke with his face at the level of and within inches of Locke's bare genitals.

71.    While performing massages and applying groin wraps, Murphy regularly touched, held, cupped, or moved Locke's penis and testicles out of his way with his bare hands or fingers, without asking for or receiving Locke's consent, and without any legitimate medical necessity.

72.    Murphy "flicked" Locke's penis with his bare fingers while laughing and saying, for example, "Hey, can you get these out of the way?"

73.    Locke estimated that without asking for or receiving Locke's consent, and without any legitimate medical necessity, Murphy touched Locke's penis and testicles with his bare hands or fingers during 75 to 100 massage treatments between August 2015 and May 2017.

74. Through repetition, and in conjunction with Locke's trust in Murphy's professional stature and his required compliance with Murphy's directions, Locke came to believe that Murphy's skin-to-skin contact with his genitals was expected and a generally accepted athletic training practice by a licensed athletic trainer. Locke did not feel that he could question or object to Murphy's treatments.

75. During one deep tissue massage treatment for hamstring tightness, Murphy directed Locke to raise himself up off the training table, after which Murphy placed his fist on the table under Locke and Murphy directed Locke to then lower himself back down to sit on Murphy's fist while he used his other hand to massage his groin. Locke trusted that Murphy had a legitimate medical reason for doing this and did not feel as if he could question Murphy or object. Locke felt Murphy's hand was very close to his anus.

76. During the period of August 2015 to May 2017, Murphy also:

    a. Made unsolicited comments about Locke's sex life;

    b. Threw condoms at Locke in the men's locker room;

    c. Put condoms in Locke's backpack;

    d. Threw Locke's compression shorts or underwear at him in the men's locker room;

    e. Joked about masturbation with student-athletes;

f. "Struck," "slapped" or "flicked" other student-athletes' penises with his bare hand or fingers in the men's shower and locker room areas within view of Locke and others;

g. Told another student-athlete he was "pitching a tent" during a treatment in the training room and slapped his covered penis; and

h. Touched the anuses of other male student-athletes with his bare hands or fingers during sports massages or deep tissue massages, without asking for or receiving their consent and without legitimate medical necessity.

77. As recently as the fall semester of 2021, Murphy conducted the mandatory drug testing for male student-athletes. Murphy required student-athletes being drug tested to remove their shorts and compression shorts and place the front hem of their shirt in their mouth. Murphy then escorted each athlete to a urinal to provide a urine specimen in a cup while he observed their genitals.

**Locke's Efforts to Seek Redress**

78. In 2021, Locke sought out the assistance of a therapist to help him come to terms with Murphy's abuse and shared the details of what had happened. Locke's therapist told Locke that the incident when he was 17 years old was sexual abuse of

a minor and as a mandatory reporter the therapist had to report it to law enforcement unless Locke was willing to do that himself.

79.     On January 19, 2022, Locke spoke with Det. Kaylia McNeill at the NCSU Police Department to report that he had been sexually abused by Murphy in 2015 through 2017.

80.     Locke was told no criminal charges could be brought against Murphy. North Carolina's SAFE Child Act of 2019, which expanded protections for victims of childhood sexual abuse was not retroactive for criminal charges. The statute of limitations for misdemeanor sexual battery had run after two years. A Class C felony charge of Sexual Contact Under the Pretext of Medical Treatment, with no statute of limitations, was not a crime until 2019.

81.     On or about January 21, 2022, after receiving a report from McNeill, NCSU contacted Locke and began a Title IX investigation through the NCSU Office for Institutional Equity and Diversity. ("OIED")

82.     On or about January 28, 2022, NCSU suspended Murphy from his position as Director of Sports Medicine.

83.     Upon reviewing the Title IX Draft Investigation Report in May 2022, Locke learned the following for the first time:

a. Head Soccer Coach Kelly Findley told Defendant Clinkscales, before Clinkscales left NCSU on or about February 26, 2016, that Murphy was engaging in conduct with male student-athletes that he believed was consistent with "grooming" behavior;

b. Murphy's duties as Director of Sports Medicine were adjusted to be more "administrative" on August 1, 2017;

c. Murphy was removed as the designated athletic trainer for the Men's Soccer team on August 1, 2017;

d. Murphy was promoted to Associate Athletic Director and given a raise in 2018;

e. Nine additional witnesses were interviewed by the Title IX investigators, including at least three male student-athletes from other teams;

f. At least one other male student-athlete corroborated Locke's claims with his own claim of being sexually abused by Murphy;

g. At least two NCSU licensed athletic trainers were interviewed by the Title IX investigators. Those trainers stated that

   i. Avoiding skin-to-skin contact with student-athletes' genitals was part of their professional training;

ii. Having student-athletes remove their underwear was generally not an acceptable practice for a licensed athletic trainer;

iii. Applying athletic wraps over student-athletes' underwear or compression shorts was their common practice; and

iv. Waiting one to two weeks before referring a student-athlete to a specialist for groin pain was their standard practice.

h. Murphy told the investigators that it was his preference to apply athletic wraps on "the bare skin" instead of over student-athletes' underwear or compression shorts.

i. Murphy participated in only one interview with the Title IX investigators on January 21, 2022 and declined requests for additional interviews. In his interview, Murphy admitted that he had touched Locke's penis and testicles with his bare hands.

84. On June 7, 2022, Locke received a call from Sheri Schwab, NCSU's Title IX Coordinator and a member of the Chancellor's Cabinet. Schwab told Locke "Rob is no longer with the University."

85. On June 17, 2022, Locke received a "Notice of Investigative Finding" letter from the OIED that stated:

A finding has been rendered in which a violation of NC State Policy 04.25.05[4] would have been substantiated via the preponderance of the evidence standard if [Murphy] was still an employee at the university. … [T]he [Athletics D]epartment is responsible for reviewing the report and determining the appropriate action to take.

86.     On June 23, 2022, Schwab told Locke that Murphy's departure was an "involuntary separation" that was unrelated to Locke's case and that nothing regarding Locke's complaint, the investigation, or the finding was reflected in Murphy's employment record. Schwab told Locke "we would have fired him, but he's no longer an employee so we can't."

87.     On July 26, 2022, Locke was allowed limited electronic viewing access to the OIED Final Investigation Report (923 pages). The names of the former student-athlete witnesses interviewed in early 2022 were redacted, ostensibly pursuant to FERPA. The names of all other non-student witnesses were redacted. The interview transcripts of all witnesses, including the transcript of Coach Kelly Findley's interview, were redacted. Murphy's interview transcript was redacted.

---

[4] The archived version of NCSU Policy 04.25.05 (Effective September 20, 2013 through July 18, 2018) outlines the University's Equal Opportunity and Non-Discrimination Policy.

88.     In the heavily redacted OIED Final Investigation Report, Locke learned for the first time that the NCSU Title IX investigators made the following determinations:

a.   It was "determined by a preponderance of the evidence that Locke's accounts of the events in question [were] more credible than Murphy's and Murphy's conduct towards Locke [was] determined to be unwelcome and of a sexual nature";

b.   "In examining the totality of the evidence gathered in [the Title IX] investigation, Locke's detailed description of the shower incident tends to support that it did occur";

c.   "Facts that tend to show severity in this case include that Locke was not in a position to question the conduct, that Locke relied on Murphy as an authority and professional in administering treatment, and that Murphy's physical contact with Locke's genitalia, based on the treatment he was receiving, would not have been medically necessary." And therefore it was "determined via a preponderance of the evidence standard that Murphy's conduct was sufficiently severe";

d. "A single instance of nonconsensual contact to student-athlete's genitalia by an athletic trainer without a showing by the trainer that such contact was appropriate under the circumstances is considered severe; for such conduct to continue over the course of two years is also pervasive." … "Therefore, … it is determined via the preponderance of the evidence standard that Murphy's conduct was pervasive";

e. "[I]t is determined by a preponderance of the evidence standard that Murphy's conduct limited Locke's ability to participate in playing soccer which is an NC State activity";

f. "[I]t is determined by a preponderance of the evidence standard that Murphy's conduct created an intimidating, threatening, or abusive educational environment"; and

g. "[I]t is determined by a preponderance of the evidence standard that Murphy's conduct was subjectively and objectively offensive."

**Injuries to Plaintiff Locke from Defendants' Course of Conduct**

89.     Despite being a recruited elite soccer player with an athletic scholarship, Locke never played a single regular season game with the NCSU Men's Soccer team in his five semesters at NCSU.

90.     In August 2017, Locke transferred to another school to complete work for his degree and play soccer. Due to the transfer, Locke had to change his major and minors to satisfy the degree requirements at his new school.

91.     Locke did not understand until the licensed athletic trainers at his new school worked on him how aberrant and professionally unacceptable Murphy's treatment tactics had been.

92.     Locke struggled with the growing realization that he had been systematically groomed and abused by Murphy for two-and-one-half years. Locke felt shame, humiliation, guilt, self-blame, self-doubt, anger, confusion, sadness and largely dehumanized by Murphy's conduct. Murphy's abuse and the stress and severe anxiety it caused Locke to experience impacted his relationships, his physical and mental well-being, and his ability to trust others.

93.     Locke tried to deal with his feelings on his own and only in 2021 did he finally seek professional psychological counseling to help him come to terms with the trauma Defendants had caused him to suffer.

94.     The NCSU Title IX investigation of Murphy prompted some members of the Men's Soccer program to make false and damaging statements about Locke to others in the NCSU athletic community.

95.     The negative impact of those false and damaging statements on Locke's well-being and reputation in the soccer community was magnified when Locke was also subjected to direct harassment via electronic communications.

96.     Due to the lofty professional stature of each defendant and their deliberate failure to comply with federal Title IX laws and NCSU's institutional non-discrimination policies, Defendants enabled Murphy to pursue his campaign of sexual abuse against Locke unencumbered by any university oversight, fostering the hostile environment at NCSU and elsewhere that plagues Locke to this day.

97.     Due to the individual failures of Woodson's oversight of Athletic director Yow, Yow's oversight of Senior Associate Athletic Director Clinkscales, and Clinkscales' oversight of the Sports Medicine program and Associate Athletic Director Murphy, plus their collective failure to comply with NCSU's anti-discrimination policies and processes, and their obstruction of NCSU's ability to respond to Coach Findley's report about Murphy in a timely and meaningful manner that would have saved Locke from being further abused by Murphy, Locke:

a. Was subjected to a hostile environment in NCSU programs and activities, to wit, men's soccer programs and events;

b. Has been falsely accused of maliciously causing Murphy to lose the Director of Sports Medicine job at NCSU;

c. Suffers from a lack of concentration and a decreased ability to perform work tasks due to the enormous distraction caused by these circumstances;

d. Suffers stress and anxiety causing a negative impact on his physical health; and

e. Suffers feelings of depression, severe anxiety, despair, fear, and humiliation, as well as feelings of intense grief at the loss of friendships, and feelings of betrayal by former friends, teammates, peers, and medical professionals.

98. As a result of the hostile environment Defendants created for Locke in NCSU programs and benefits, he felt compelled to transfer away from NCSU after only five semesters.

99. Defendants' actions, individually and collectively, effectively excluded Locke from, denied him the benefits of, and subjected him to discrimination in NCSU programs, events, and activities that he had previously participated in,

benefitted from, and enjoyed as an NCSU student-athlete and men's soccer team member.

## COUNT I
## Violations of Title IX
## (Hostile Educational Environment and Deliberate Indifference)
## 20 U.S.C. § 1681, et seq.
(v. NCSU; Woodson, as agent for NCSU; Yow, as agent for NCSU;
Clinkscales as agent for NCSU; and Murphy as agent for NCSU)

100.   All Paragraphs of this pleading are incorporated herein by reference.

101.   This count in its entirety is related to sexual abuse suffered while Locke was under the age of 18.

102.   Title IX prohibits discrimination on the basis of sex in a school's educational programs or activities, which include all of the school's operations. 20 U.S.C. §§ 1681(a), 1687.

103.   NCSU receives federal grant funding and/or has students who receive federal student financial aid, and thereby is a recipient of federal funds and must comply with Title IX.

104.   A victim of discrimination based on his sex has a private right of action under Title IX against the offending school for monetary damages and equitable relief.

105.   In *Davidson v. Univ. of NC at Chapel Hill*, the North Carolina Court of Appeals addressed an issue of first impression as to whether a university has an affirmative duty of care toward a student-athlete who is a member of a school-sponsored, intercollegiate team. The court held that "the defendant did owe an affirmative duty of care to plaintiff as a matter of law." 543 S.E.2d 920, 142 NC App. 544 (N.C. App. 2001) In assessing the relationship between a student-athlete and the school, the could reasoned "the defendant may be held liable if a *special relationship* existed between the parties sufficient to impose upon the defendant a duty of care." (*Id*.) (emphasis added)

106.   Defendants had a duty of reasonable care to its student-athletes including Locke.

107.   Defendants had a duty to act in good faith in responding to Findley's report of Murphy's potential sexual harassment.

108.   Defendants had a duty to Locke to provide him with a safe environment in which he would be free from sexual harassment from members of the athletic department staff.

109.   Defendants undertook a duty to provide Locke with appropriate, safe, and professional athletic training services by creating a Sports Medicine Department

32

and by hiring an NCBATE licensed athletic trainer as the Director of Sports Medicine to oversee that department.

110.   "[T]o establish a continuing violation … the plaintiff must establish that the unconstitutional or illegal act was a … fixed and continuing practice." *Nat'l Advert. Co.,* 947 F.2d at 1166. "A fixed and continuing practice exists where the same alleged violation is repeated by the same actor in a series of separate acts." *Id.* at 1167 (quoting *Perez v. Laredo Junior Col*., 706 F.2d 731, 733 (5th Cir. 1983)). (Internal quotes omitted.) *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

111.   Altogether, Murphy engaged in a fixed and continuing practice in that he repeated the same alleged violation over a period of years in an extended series of separate acts.

112.   Two acts may be the same "violation" of federal discrimination laws even where the facts giving rise to the violation are quite different. *See, e.g., Bradley*, 707 F.Supp. at 219, 221 (finding a landlord's refusal to intervene to protect a tenant from racial harassment and subsequent effort to force her to vacate her home were a single violation of Title VI). *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

113.   Murphy's acts of observing Locke naked and his acts of skin-to-skin nonconsensual contact with Locke's genitals, along with NCSU's, Yow's and Clinkscales' failures to act or to adequately address Murphy's discriminatory conduct after Coach Findley reported it to Clinkscales, established a fixed and continuing practice. Despite the facts of each act being quite different, the first two being direct acts of discrimination based on Locke's sex and the last being NCSU's, Yow's and Clinkscales' failure to address that sex discrimination, together they constitute the same violation of federal discrimination laws under Title IX.

114.   "Courts consider two factors to determine whether an act was a fixed and continuing practice, including (1) the harm to the plaintiff and whether that harm has been compounded by further governmental actions and (2) whether unfairness results from finding the continuing wrong exception inapplicable." *Miller v. King George Cty.*, 277 Fed.Appx. 297, 299 (4th Cir. 2008); *see Nat'l Advert. Co.*, 947 F.2d at 1167-68. "It is continual unlawful acts, not continual ill effects from an original violation, that constitutes a continuing course of racially discriminatory conduct." *A Soc'y Without A Name*, 655 F.3d at 348. *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

115. The harm done to Locke by Murphy's abuse was compounded by Defendants' failures to take adequate action to stop Murphy's conduct after Findley's report to Clinkscales.

116. The continual unlawful acts that caused Locke's harm in 2015 when he was under 18 were part of a fixed and continuing practice that continued through 2017 when he was over 18. A finding that the continuing wrong exception is inapplicable to the harm done after Locke's 18th birthday would be an unfair result in this instance.

117. NCSU, Woodson, Yow, and Clinkscales discriminated against Locke when they decided not to address or inadequately addressed Coach Findley's concern that Murphy was grooming student-athletes for sexual purposes.

118. Locke was subjected to acts of discrimination on the basis of his sex by Murphy while Murphy was in the furtherance of his NCSU employment duties in 2015, 2016 and 2017.

119. Woodson, Yow, and/or Clinkscales ignored Findley's report to Clinkscales or concealed it from the NCSU OIED, contrary to federal law and NCSU policies.

120. "An institution will be deemed deliberately indifferent to harassment 'only where [its] response to the harassment or lack thereof is clearly unreasonable

in light of the known circumstances.'" *Rouse v. Duke Univ.*, 914 F.Supp.2d 717, 723-24 (M.D. N.C. 2012), aff'd, 535 Fed.Appx. 289 (4th Cir. 2013) (alteration in original) (quoting *Davis*, 526 U.S. at 648). *Davis v. Univ. of N.C. at Greensboro* (M.D. N.C. 2022).

121.    Locke was sexually abused and harassed by Murphy in early 2015. Defendants' actions and inactions after receiving actual notice about Murphy's conduct from Findley, were unreasonable in light of the substance of Findley's report and the known circumstances of Murphy's access to student-athletes, thereby allowing Murphy to engage in additional acts of sexual abuse against Locke.

122.    Murphy remained in his position as Assistant Athletic Director until 2018, when he was promoted to Associate Athletic Director. And given a raise.

123.    Murphy took advantage of the extraordinary imbalance of power and privilege between he, an Assistant Athletic Director and the Director of Sports Medicine at NCSU, an NCAA Division I school, and Locke, an injured teen-aged athlete, to engage in a continuous course of action by sexually abusing and harassing Locke over the next two years to Locke's great detriment and in a manner fundamentally contrary to NCSU policies and federal Title IX law.

124.    Clinkscales' and/or Yow's decisions not to report Coach Findley's information about Murphy's conduct to OIED or to take any effective action to stop

it, as each had a duty to do, were erroneous and contrary to NCSU policy and federal law – and were transparent attempts to avoid negative professional consequences for all Defendants and preserve the status quo at NCSU at Locke's expense.

## COUNT II
### Invasion of Privacy (Offensive Intrusion)
(v. NCSU; and Murphy, in his Official Capacity)

125.    All Paragraphs of this pleading are incorporated herein by reference.

126.    This count is related to sexual abuse suffered while Locke was under the age of 18.

127.    "The tort of invasion of privacy, which is defined under North Carolina law as the intentional intrusion physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … [where] the intrusion would be highly offensive to a reasonable person." *Curry v. Schletter Inc.,* 2018 WL 1472485, at *4 (W.D.N.C. Mar. 26, 2018). (Internal quotes omitted.) *Walton v. Villines* (W.D.N.C. 2021).

128.    Murphy first invaded Locke's privacy with an offensive intrusion on March 29, 2015 when he physically transported 17 year-old Locke, who was disoriented and physically compromised, to WBAF and made him shower while Murphy watched under the guise of medical necessity.

129.   Murphy again invaded Locke's privacy with an offensive intrusion on December 11, 2015, when he physically remained in the exam room and observed while a doctor performed a needless digital rectal exam on Locke.

130.   Murphy repeatedly invaded Locke's privacy with an offensive intrusion each of the 75 to 100 times he made nonconsensual physical skin-to-skin contact with his hands or fingers on Locke's genitals between August 2015 and May 2017.

131.   Murphy engaged in these acts of sexual harassment at the expense of Locke's right to privacy under North Carolina law.

132.   Because NCSU employed Murphy as Director of Sport Medicine, because Murphy's acts of sexual harassment were done in the performance of his official duties, and because NCSU Athletic Department forms for incoming student-athletes mandated that Locke follow all directions of the Sports Medicine staff, Defendant NCSU is also liable on a *respondeat superior* basis.


## COUNT III
## Negligent Supervision and Training
(v. NCSU; Woodson, Yow, and Clinkscales, in their official capacities)

133.   All Paragraphs of this pleading are incorporated herein by reference.

134.   This count is related to sexual abuse suffered while Locke was under the age of 18.

135.   "North Carolina recognizes claims of negligent training based on the general elements of negligence. *Swick v. Wilde*, No. 1:10-cv-303, 2012 WL 3780350, at \*30 (M.D.N.C. Aug. 31, 2012) (citing *Floyd v. McGill*, 575 S.E.2d 789, 793-94 (N.C. Ct. App. 2003)." See also *Aleman v. City of Charlotte* (W.D. N.C. 2021).

136.   "To make out a claim for negligence, a plaintiff must establish: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) and the breach was an actual and proximate cause of the plaintiff's injury." *Shook v. Lynch & Howard, P.A.*, 563 S.E.2d 196, 197 (N.C. Ct. App. 2002). *Aleman v. City of Charlotte* (W.D.N.C. 2021)

137.   "Claims of negligent supervision and training are grounded in active negligence by the employer." *Nance v. Rowan-Salisbury Bd. of Ed.*, 336 F.Supp.3d 593, 597 (M.D. N.C. 2018) (*quoting Davis v. Matroo*, 2013 WL 5309662, at \*5 (E.D.N.C. Sept. 19, 2013)); *See also Corbett v. Perry* (W.D.N.C. August 29, 2021).

138.   To establish a claim for negligent supervision or training under North Carolina law, "a plaintiff must prove: (1) the specific negligent act on which the action is founded; (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; (3) either actual notice to the [defendant] of such unfitness or bad habits, or constructive notice, by showing

39

that the [defendant] could have known the facts had he used ordinary care in oversight and supervision; and (4) that the injury complained of resulted from the incompetency proved." *Beard v. Town of Topsail Beach*, 2021 WL 2638147, at *12 (E.D. N.C. June 25, 2021) (quoting *Medlin v. Bass*, 327 N.C. 587, 590-91 (1990)) (emphasis omitted). *See also Corbett v. Perry* (W.D.N.C. 2021).

139.  "A plaintiff has the burden to prove that the employer knew or had reason to know of the employee's incompetency. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 249-50 (4th Cir. 2000)." *Corbett v. Perry* (W.D.N.C. 2021)

140.  Pursuant to federal law under Title IX, NCSU has adopted an institutional policy that requires it to establish procedures to train and supervise its employees, so they comply with its policies related to public safety and sexual harassment, thereby creating NCSU's duty to conduct such training and supervision with reasonable skill and care.

141.  NCSU's policies require that all Athletic Department employees receive annual training on their responsibilities and duties under NCSU Policies and Title IX.

142.  NCSU, Woodson, Yow, and/or Clinkscales neglected their duty and failed to provide adequate annual NCSU anti-discrimination and sexual harassment policy and Title IX training to Murphy.

143.   NCSU, Woodson, Yow, and/or Clinkscales neglected their duty and failed to ensure that Murphy was able and willing to comply with the spirit and letter of the University's anti-discrimination policies and Title IX.

144.   NCSU, Woodson, Yow, and/or Clinkscales neglected their duty and failed to ensure that Murphy was complying with University policies and Title IX, even after they were confronted with Coach Findley's report that he was not.

145.   Because Yow and/or Clinkscales were aware or should have been aware of Murphy's conduct, enabled it, and did nothing to stop him from engaging in it, specifically in their roles as NCSU athletic department Directors, Defendant NCSU is also liable on a *respondeat superior* basis.

146.   Defendants' actions and lack of action with regard to their duty under NCSU's sexual misconduct prevention training and education policy caused Locke to sustain substantial injury, damage, and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; and past and future economic loss.

**COUNT IV**
**Battery**
(v. NCSU; and Murphy, in his official capacity)

147.   All Paragraphs of this pleading are incorporated herein by reference.

148.   This count is related to sexual abuse suffered while Locke was under the age of 18.

149.   "'The elements of battery are intent, harmful or offensive contact, causation, and lack of privilege.' *Hawkins v. Hawkins*, 101 N.C.App. at 533, 400 S.E.2d at 475. '...'" *Wilson By and Through Wilson v. Bellamy*, 414 S.E.2d 347, 105 N.C.App. 446 (N.C. App. 1992).

150.   Murphy made intentional contact with Locke's genitals each of the 75 to 100 times he held, cupped, moved, or "flicked" Locke's genitals while making skin-to-skin contact with his hands or fingers between August 2015 and May 2017. The dates and times of each specific contact will be established through discovery and/or at trial.

151.   Each of Murphy's 75 to 100 contacts with  Locke's genitals made by skin-to-skin contact with his hands or fingers in that time period was nonconsensual and an offensive contact to Locke.

152.   Each of Murphy's 75 to 100 contacts with  Locke's genitals made by skin-to-skin contact with his hands or fingers in that time period caused Locke emotional distress and other cumulative harms.

153.   Each of Murphy's 75 to 100 contacts with  Locke's genitals made by skin-to-skin contact with his hands or fingers in this time period were done without a legitimate medical necessity or other privilege.

**COUNT V**
**Negligence and Gross Negligence**
**PUNITIVE DAMAGES**
(v. NCSU; Woodson, Yow, and Clinkscales, in their official capacities; and Murphy, in his official and individual capacities)
*Joint and Several Liability*

154.   All Paragraphs of this pleading are incorporated herein by reference.

155.   This count is related to sexual abuse suffered while Locke was under the age of 18.

156.   "North Carolina defines gross negligence as 'wanton conduct done with conscious or reckless disregard for the rights and safety of others.' *Yancey v. Lea*, 550 S.E. 2d 155, 158 (N.C. 2001)." *Thackurdeen v. Duke Univ*. (M.D. N.C. 2018)

157.   "In order to state a claim for gross negligence, a plaintiff must allege … (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach was a proximate cause of the injury; (4) the plaintiff was injured as a result thereof and (5) the defendant's conduct was willful, wanton, or done with reckless indifference. Willful conduct is done with a deliberate purpose. Conduct is

willful when it is carried out with a wicked purpose or with reckless indifference. *Ross v. Tennessee Commercial Warehouse, Inc.*, No. 3:14-cv-00391, 2014 WL 4672424 at *2 (W.D.N.C. Sept. 18, 2014) (quoting *Simpson v. Amylin Pharms., Inc., et al.*, No. 1:11-cv-301, 2012 WL 3240142, at *3 (W.D.N.C. Aug. 7, 2012) *Thackurdeen v. Duke Univ*. (M.D. N.C. 2018).

158.  "[N]egligence may arise where a 'special relationship' exists between the parties. See *King v. Durham County Mental Health Authority*, 113 N.C.App. 341, 345, 439 S.E.2d 771, 774, disc. review denied, 336 N.C. 316, 445 S.E.2d 396 (1994)." *Davidson v. Univ. of NC at Chapel Hill*, 543 S.E.2d 920, 142 NC App. 544 (N.C. App. 2001).

159.  "[W]here the alleged negligence is premised on a defendant's failure to protect a plaintiff from a harm that the defendant did not directly create, as in the instant case, the defendant may be held liable if a special relationship existed between the parties sufficient to impose upon the defendant a duty of care." *Davidson v. Univ. of NC at Chapel Hill*, 543 S.E.2d 920, 142 NC App. 544 (N.C. App. 2001)

160.  "Various scholars, authorities, and courts in other jurisdictions considering the issue before us have recognized that special relationships are most often premised upon the existence of mutual dependance." *See* Edward H. Whang,

44

*Necessary Roughness: Imposing a Heightened Duty of Care on Colleges for Injuries of Student-Athletes*, 2 Sports Law J. 25, 39 (1995) (hereinafter Whang); Restatement (Second) of Torts § 314A, cmt. b (1965). *Davidson v. Univ. of NC at Chapel Hill*, 543 S.E.2d 920, 142 NC App. 544 (N.C. App. 2001).

161.   NCSU had a mutual dependence and therefore a special relationship with its student-athlete Locke and owed him a duty of reasonable care to keep him safe from the negligence of its employees, including Murphy, Yow, Woodson, and Clinkscales.

162.   NCSU and Clinkscales breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others including Locke when Clinkscales did not take adequate action on Findley's report or forward that report to Yow for action by the Athletic Department.

163.   NCSU, Clinkscales and Yow breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others including Locke when Clinkscales and/or Yow did not forward Findley's report to the Title IX Coordinator for action by OIED.

164.   NCSU, Clinkscales and Yow breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others when they failed

to take action to protect student-athletes including Locke from Murphy after they received Findley's report.

165.   NCSU, Clinkscales and Yow breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others including Locke when they failed to take any actions to warn student-athletes including Locke about Murphy after receiving Findley's report.

166.   NCSU Clinkscales and Yow breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others when they did not effectively stop Murphy from touching and observing the genitals of male student-athletes including Locke without medical necessity.

167.   NCSU and Murphy breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others when Murphy used his position of authority as Director of Sports Medicine to touch Locke's genitals and to observe Locke undressed without medical necessity.

168.   NCSU and Murphy breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others including Locke when Murphy touched Locke's genitals without his consent and under the pretext of medical necessity.

169. NCSU and Murphy breached that duty willfully, wantonly and/or with reckless disregard for the rights and privileges of others when Murphy transported Locke, a minor athlete who was disoriented on pain medication, to the athletic training room area where he touched Locke's thighs while wrapping his legs, sent his parents home, and stood nearby and observed Locke while he was seated and showering for no legitimate medical reason.

170. After Defendants received Findley's credible report of Murphy's potential sexual harassment, Defendants had a duty to handle that report properly and in good faith.

171. It was reasonably foreseeable, given the substance of Findley's report, that Murphy would continue to engage in the same behaviors with student-athletes including Locke and Defendants should have taken additional steps to prevent that from occurring.

172. Each and all of the above breaches of Defendants' duties, individually and collectively, was willful, wanton, and done with a reckless, conscious, and intentional disregard of the rights, health, and well-being of others, including Locke.

173. Defendants, individually and collectively, knew or should have known that their derogation of those duties was likely to result in significant injury and harm to others, including Locke.

174. Because Clinkscales and/or Yow had actual notice of Murphy's conduct, took inadequate measures, if any, to stop him from engaging in it, and thereby enabled it to continue, particularly in their roles as NCSU Directors, Defendant NCSU is also liable on a *respondeat superior* basis.

175. As a direct and proximate result of the negligence and/or gross negligence of Defendants, individually and collectively, Locke has suffered substantial damage for which Defendants, jointly and severally, should be required to pay as more specifically set forth herein.

176. Defendants' failure to act in good faith on Findley's credible allegations of sexual impropriety or grooming behavior by Murphy towards student-athletes demonstrated willful and/or wanton and/or reckless disregard for the rights and safety of others, to wit, hundreds of student-athletes, including Locke.

177. Woodson, Clinkscales, and Yow, having knowledge that Murphy created a hostile environment for Locke, with the result that Locke lost his NCSU scholarship financial benefits, ended his NCSU educational progress and NCSU soccer career, and sustained harm to his physical health and general well-being, NCSU is responsible on the basis of *respondeat superior.*

178. Defendants commission of these unlawful acts of sex discrimination proximately caused Locke to sustain substantial injury, damage, and loss, including

but not limited to mental anguish; severe emotional distress; injury to reputation; and past and future economic loss.

179.   Based upon the conduct of the Defendants, which was, as alleged, willful and/or wanton and/or done with reckless disregard for the rights and privileges of others, including Locke, Locke is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Benjamin Locke respectfully requests judgment in his favor and against Defendants, jointly and severally, as follows:

180.   Compensatory damages for Plaintiff's psychological and emotional distress and damages, damage to his reputation, and his out-of-pocket expenses incurred in response to these circumstances. These damages arise under the Title IX claims, as well as the separate causes of action which stem from state law which the Plaintiff prays the Court allow to be heard under its pendent jurisdiction;

181.   Punitive damages;

182.   Injunctive relief requiring Defendants NCSU and Woodson to take prompt and effective steps to:

a.   Eliminate opportunities for sexual harassment and discrimination in its Sports Medicine Department for all student-athletes;

b. Provide mandatory training on its Title IX policies and procedures to all designated Athletics Department Responsible Employees and to post those training materials on its athletic department website;

c. Provide annual training to all Athletics Department Directors, coaches, trainers and staff, regarding what constitutes sexual harassment and how to report and respond to complaints of sexual harassment and to provide such training to new employees within four weeks of their start date;

d. Provide annual training to all student athletes, student managers, and student trainers concerning NCSU's Title IX Policies and Procedures within four weeks of the start of such students' participation in their sport;

e. Provide training on the requirements that the Athletic Department staff notify the Title IX Coordinator of all instances of actual knowledge of sexual harassment and maintain the required documentation of complaints of sexual harassment;

f. Take appropriate steps to address any failures on the part of staff including senior level administrators and Athletic Directors, coaches, and medical staff to ensure that all complaints of sexual

harassment were immediately reported to the Title IX Coordinator and that other appropriate steps were taken consistent with Title IX;

g. Identify and notify all other potential victims of Murphy's sex-based harassment and sexual harassment who were male student-athletes at NCSU between January 4, 2012 and January 31, 2022 and provide individual remedies as appropriate to any identified victims;

h. Appropriately respond according to established policies to all reported conduct that may constitute sexual harassment or discrimination according to established policies;

i. Timely investigate reported conduct that may constitute sexual harassment according to established policies;

j. Mitigate the effects of any hostile environment that may arise from sexual harassment or discrimination according to federal law; and to

k. Promptly rescind the protocol document filed with NCBATE for licensing purposes that named Murphy as an NCSU employee who was overseen by an NCSU team doctor;

183. Interest on the damages he is awarded;

184. Costs; and

185. Reasonable attorney fees pursuant to 42 U.S.C. § 1988.

186.    Plaintiff further requests that all issues complained of herein be tried by a jury.

Respectfully submitted and filed this the 30th day of August, 2022.

KERSTIN WALKER SUTTON PLLC

Kerstin Walker Sutton
Durham, NC
(919) 617-0009
kws@kwsutton.com
NC State Bar No. 30008

## CERTIFICATE OF SERVICE

I certify that on 30 August 2022, I caused a true and correct copy of the foregoing Complaint to be served upon North Carolina State University, Office of General Counsel, and all parties via the Court's ECF/CM system and by hand delivery for all Defendants to:

    Allison Newhart, General Counsel
    20 Watauga Club Drive
    304 Holladay Hall
    Campus Box 7008
    Raleigh, North Carolina 27695-7008

    and

    Kenzie Rakes, Asst. Attorney General
    North Carolina Department of Justice
    112 W. Edenton St.
    Raleigh, NC 27603

And for the individual Defendants, for whom service is not waived, by hand delivery to:

    William R. Woodson
    1570 Main Campus Dr.
    Raleigh, NC 27606

    Deborah A. Yow
    100 Beaujolais Ct.
    Cary, NC 27511

1

Lester S. Clinkscales
1104 Harbor Point Rd.
Terre Haute, IN 47803

Robert M. Murphy, Jr.
400 W. North St. #1628
Raleigh, NC 27603

Respectfully,

_____
Kerstin Walker Sutton, Esq.

2