**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:22-cv-00344-FL**

| | |
|---|---|
| BENJAMIN LOCKE,<br><br>      Plaintiff,<br><br>v.<br><br>NORTH CAROLINA STATE UNIVERSITY; WILLIAM R. WOODSON, in his official capacity; DEBORAH A. YOW, in her official capacity; LESTER S. CLINKSCALES, in his official capacity; and ROBERT M. MURPHY, JR., in his official and individual capacities,<br><br>      Defendants. | **DEFENDANT NORTH CAROLINA STATE UNIVERSITY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**<br><br>**Fed. R. Civ. P. 12(b)(1)**<br>**Fed. R. Civ. P. 12(b)(2)**<br>**Fed. R. Civ. P. 12(b)(6)** |

Defendant North Carolina State University ("NC State") respectfully submits this Memorandum in Support of Its Motion to Dismiss Plaintiff's Amended Complaint (DE 104).

## NATURE OF THE CASE

Plaintiff Benjamin Locke ("Locke") was a student-athlete at NC State between 2015 and 2017. He filed this action against NC State for violations of Title IX in connection with alleged sex discrimination stemming from inappropriate conduct and contact from athletic trainer Robert Murphy ("Murphy"). Locke's Amended Complaint, though based on the same underlying facts as the original Complaint, asserts new allegations and claims against NC State, Deborah Yow ("Yow"), Michael Lipitz ("Lipitz"), Lester Clinkscales ("Clinkscales"), Raymond Harrison ("Harrison"), and Murphy, as captioned above. The claims against NC State under Title IX and 42 U.S.C. § 1983 are time-barred by the statute of limitations. Even if Locke's claims were timely, his Section 1983 claim is barred by the doctrine of sovereign immunity. Further, Locke fails to

state a claim under Section 1983 for failure to train, and his claim under Title IX similarly fails because Locke does not allege in the Amended Complaint that notice of Murphy's alleged misconduct was given to an appropriate person.

However, the fact that NC State seeks dismissal of these claims should not be construed to mean that either NC State or its leadership condones sexual misconduct. Rather, to be clear, sexual misconduct of any kind is completely unacceptable, is prohibited by NC State's policies, and is in direct opposition to the mission, culture, and standards of NC State.

## STATEMENT OF THE FACTS[1]

In January 2015, Benjamin Locke started his freshman year at NC State. (DE 104 ¶ 12 [hereinafter "Am. Compl."].) Locke was recruited and awarded a scholarship to join the university's men's soccer team. (Id. ¶ 27.) While Locke was enrolled at NC State, Robert Murphy was the Director of Sports Medicine. (Id. ¶ 30.) In this role, Murphy was responsible for "direct oversight and coordination of day-to-day athletic training, medical services operations, and sports medicine facility management for [NC State's] 23 NCAA Division I teams and the approximately 550 student-athletes enrolled each year." (Id. ¶ 31.) Murphy was also the designated team trainer for NC State's men's soccer team. (Id. ¶ 37.)

Locke alleges inappropriate conduct by Murphy, some of which is alleged to have occurred in March 2015, while other conduct is alleged to have occurred from the fall of 2015 through May 2017, at which time Locke left NC State. As alleged in the Amended Complaint, such conduct includes Murphy watching Locke take a shower at NC State's athletic facility following a surgical

---

[1] NC State recites the allegations in Plaintiff's Amended Complaint because the Plaintiff's allegations are taken as true for purposes of a motion under Rule 12(b)(6). See, e.g., In re Birmingham, 846 F.3d 88, 92 (4th Cir. 2017). Any such recitation of facts herein should not be taken as an admission of said facts or concession to their veracity.

procedure when Locke was under 18 and, at a later time when Locke was 18 and over, inappropriate touching while Murphy was administering treatment to Locke for athletic injuries. (Id. ¶¶ 35, 38, 39, 41, 42, 45, 50, 54–55, 56, 58, 64, 66, 69, 71–76.) Upon transfer to another school in August 2017, Locke's interactions with trainers at his new institution reinforced to Locke that Murphy had acted inappropriately. (Id. ¶ 93.)

Almost five years later, on January 19, 2022, Locke reported his alleged abuse to NC State's police department. (Id. ¶ 79.) Two days later, on January 21, 2022, NC State's Office for Institutional Equity and Diversity ("OIED") began a Title IX investigation. (Id. ¶ 81.) Less than 10 days after Locke's report, on January 28, 2022, NC State suspended Murphy from his position as Director of Sports Medicine. (Id. ¶ 83).

Locke reviewed a draft investigative report in May 2022. (Id. ¶ 84.) Locke learned on June 7, 2022, that Murphy was no longer employed by NC State. (Id. ¶ 85.) On June 17, 2022, Locke was informed through a Notice of Investigative Finding that Murphy would have been found to have violated NC State's policies were he still employed by NC State. (Id. ¶ 86.)

## LEGAL STANDARD

### A.   Sovereign Immunity

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011). More particularly, "[t]he Eleventh Amendment to the United States Constitution limits the jurisdiction of the federal courts to hear cases against states and state employees acting in their official capacities." Alston v. N.C. A&T State Univ., 304 F. Supp. 2d 774, 782 (M.D.N.C. 2004); accord Kitchen v. Upshaw, 286 F.3d 179, 183–84 (4th Cir. 2002). As an arm of the state, public universities are entitled to the

protections offered by the sovereign immunity doctrine and may not be sued without their consent. See Huang v. Bd. of Governors, 902 F. 2d 1134, 1138 (4th Cir. 1990).

There is an open question among federal courts as to whether a motion to dismiss on sovereign immunity grounds is properly presented under Rules 12(b)(1), 12(b)(2), or 12(b)(6). See Vaughn v. Transdev Servs., 179 F. Supp. 3d 559, 563 n.2 (E.D.N.C. 2016) (observing that "federal courts have tended to minimize the importance of the designation of a sovereign immunity defense as either a Rule 12(b)(1) motion regarding subject matter jurisdiction or a Rule 12(b)(2) motion regarding jurisdiction over the person" and that several Supreme Court cases "suggest that the defense may be addressed as a matter of sufficiency of the pleading, pursuant to Rule 12(b)(6)." (quoted authority omitted)). Accordingly, NC State moves under Rules 12(b)(1), 12(b)(2), and 12(b)(6).

**B.      Rule 12(b)(6)**

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). "To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Elliot v. Am. States Ins. Co., 883 F.3d 384, 395 (4th Cir. 2018) (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[A] complaint must allege facts sufficient 'to raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible.'" Burnette v. Fahey, 687 F.3d 171, 180 (4th Cir. 2012) (internal quotation marks and alterations omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

4

plausibility of entitlement to relief.'" Ashcroft, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

In conducting this review, "a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007). However, a court need not take as true "bare legal conclusions" or statements unsupported by sufficient factual allegations, Burnette, 687 F.3d at 180, or mere recitations of the elements of a cause of action, Ashcroft, 556 U.S. at 678.

Notably, when it appears on the face of the complaint that the limitations period has run, a defendant may properly assert a limitations defense through a motion to dismiss for failure to state a claim. See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F. Supp. 2d 544, 552 (M.D.N.C. 2003), aff'd sub nom., Faircloth v. Fin. Asset Sec. Corp. Mego Mortg. Homeowner Loan Tr., 87 F. App'x 314 (4th Cir. 2004).

## ARGUMENT

Locke's First Amended Complaint contains two claims against NC State: a hostile educational environment and pre-report deliberate indifference claim under Title IX (the "Title IX Claim") and failure to train claim under 42 U.S.C. § 1983 (the "Section 1983 Claim"). Both of these claims fail as a matter of law.

## I.    LOCKE'S CLAIMS ARE UNTIMELY

### A.    Locke's Claims are Subject to a Three-Year Statute of Limitations.

As a threshold matter, Locke's Title IX Claim is subject to a three-year statute of limitations, commensurate with the limitations period applicable to personal injury actions in North Carolina, N.C. Gen. Stat. § 1-52(16). See Reid v. James Madison Univ., 90 F.4th 311, 318–19 (4th Cir. 2024) ("[E]very circuit to consider the issue has held that Title IX . . . borrows the

relevant state's statute of limitations for personal injury." (omission in original) (quoting <u>Wilmink v. Kanawha Cnty. Bd. of Educ.</u>, 214 F. App'x 294, 296 n.3 (4th Cir. 2007) (per curiam))); <u>see also Rouse v. Duke Univ.</u>, 535 F. App'x 289, 294 (4th Cir. 2013) (applying three-year personal injury statute of limitations to Title IX claim). Likewise, the Section 1983 claim is also subject to a three-year statute of limitations, as it is "governed by 'the statute of limitations from the most analogous state-law cause of action.'" <u>Reid</u>, 90 F.4th at 318 (quoting <u>Owens v. Balt. City State's Att'ys Off.</u>, 767 F.3d 379, 388 (4th Cir. 2014)); <u>Owens v. Okure</u>, 488 U.S. 235, 236 (1989) ("[C]ourts entertaining claims brought under 42 U.S.C. § 1983 should borrow the state statute of limitations for personal injury actions.").

Murphy's alleged inappropriate conduct ended in 2017, and Locke transferred away from NC State in May of that same year. Locke did not bring this action until August 2022, more than three years after the alleged abuse had occurred. Even to the extent any claims relate to conduct that occurred while Locke was a minor, he had three years from when he turned 18 in 2015 to act upon them. <u>See</u> N.C. Gen. Stat. § 1-17(a). Because he failed to bring either of his claims until 2022, long after the acts underpinning this case had ended, Locke's Title IX Claim and Section 1983 Claim are time-barred.

### B.  The Discovery Rule Does Not Apply to Toll Locke's Claims.

Locke's untimely claims cannot be revived by application of any tolling doctrine, such as the discovery rule. "Although state law determines the length of the limitation period, accrual of § 1983 claims and Title IX claims is governed by federal law." <u>Reid</u>, 90 F.4th at 319; <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007). "Under federal law[,] a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." <u>Nasim v. Warden</u>, 64 F.3d 951, 955 (4th Cir. 1995). Thus, for a personal injury cause

6

of action to accrue, a plaintiff need only know that he has been injured and who inflicted the injury. Id.; see, e.g., Oldham v. Univ. of N.C., No. 22-CV-513, 2023 WL 3984031, at *10–11 (M.D.N.C. June 13, 2023) (holding that "[f]or limitations and accrual purposes, Title IX has been treated like 42 U.S.C. § 1983" and that for those claims, "[t]he 'critical facts' that start the accrual clock are the injury and who inflicted it"); Doe v. Va. Polytechnic Inst. & State Univ., 617 F. Supp. 3d 412, 432 (W.D. Va. 2022) (same in context of Title IX hostile environment claim).

Here, Locke was aware of his alleged injury and the perpetrator—the alleged inappropriate acts by Murphy—after they occurred. This put Locke on inquiry notice, "imposing on him a duty to inquire about the details of [the claim] that are reasonably discoverable." Nasim, 64 F.3d at 955. Once a plaintiff "know[s] that he has been hurt and who inflicted the injury . . . ', he is on inquiry notice and has a duty to inquire about reasonably discoverable details.'" Va. Polytechnic Inst. & State Univ., 617 F. Supp. 3d at 432 (internal citation and quoted authority omitted); see also United States v. Kubrick, 444 U.S. 111, 123 (1979) ("To excuse [plaintiff] from promptly [making inquiry] by postponing the accrual of his claim would undermine the purpose of the limitations statute.").

Locke alleges in several places in his Amended Complaint that he learned "for the first time" in 2022 and in 2025—after the statute of limitations had expired on his claims—that NC State had knowledge of the alleged harassment. (See Am. Compl. ¶¶ 84, 90.) Locke thus seemingly argues that the discovery rule should apply to toll his claims. However, neither Title IX nor 42 U.S.C. § 1983 expressly contains a discovery rule. Even if such a rule applied, the critical point that starts the accrual clock is "discovery of the injury, not discovery of other elements of a claim[.]" Rotella v. Wood, 528 U.S. 59, 555 (2000). Thus, once a plaintiff becomes aware of relevant facts, the claim begins to accrue. See Wilmink, 214 F. App'x at 295–98 (holding

that discovery rule did not apply to toll plaintiff's Title IX and section 1983 claims); cf. Del. State Coll. v. Ricks, 449 U.S. 250, 257–58 (1980) (Title VII discrimination claim began to accrue once tenure was denied and decision was communicated to plaintiff, even though negative effects of denial did not manifest until later).

Wilmink, though an unpublished case, offers a helpful illustration of the application of this analysis. In that case, the plaintiff alleged violations of Title IX and 42 U.S.C. § 1983 against her former school board for failing to prevent sexual abuse by one of its teachers. Wilmink, 214 F. App'x at 295. The plaintiff contended that the discovery rule applied to toll the statute of limitations applicable to her claims. Id. The Court applied West Virginia precedent, which, similarly to Nasim and Rotella, provided that a statute of limitations begins to run once a plaintiff knows or should know of the injury, the identity of the entity that may have breached a duty to plaintiff, and the causal connection between the entity and the injury. Wilmink, 214 F. App'x at 296–97. For the final factor, the plaintiff was required to establish that she neither knew, nor had reason to know by the exercise of reasonable diligence, that defendants had some causal relation to her injury. Id.

In this context, the Wilmink court held that the plaintiff was dilatory in investigating the school board's role in the alleged assault and that she did not provide any evidence justifying her delay in investigation. Id. at 297. As a result, the statute of limitations for her claims against the school board began to run after the alleged assault and her claims were thus time-barred by the time the lawsuit was filed. Id. Applying similar logic to this case under Nasim, Locke was aware of Murphy's alleged misconduct in 2017 and was on inquiry notice to investigate NC State's potential role in it at that time. Accordingly, his claims against NC State began to run in 2017 and are now time-barred.

8

In similar discrimination-related contexts, the Fourth Circuit has specifically declined to apply a discovery rule, such as in <u>Hamilton v. 1st Source Bank</u>, 928 F.2d 86 (4th Cir. 1990). In that case, an employee alleged that his employment had been wrongfully terminated because of age discrimination. <u>Id.</u> at 86–87. While pursuing the claim, he realized that he had received a lesser salary than younger employees in his role. <u>Id.</u> at 87. As a result, the plaintiff sought to amend his complaint to include a pay discrimination claim; however, by that time, the limitations period for that claim had passed. <u>Id.</u> The plaintiff asserted that his action was timely under the discovery rule, arguing that the limitations period did not begin to run until he discovered that he was a victim of discrimination. <u>Id.</u> at 86. The Fourth Circuit rejected that argument, explaining that such application of the rule "substitutes a vague and uncertain period for a definite one" and that "when Congress has intended a discovery rule, it has proven capable of writing one." <u>Id.</u> at 88. Thus, the Fourth Circuit concluded that the last possible time the pay discrimination claim could have been lodged was when the plaintiff received his final paycheck—the date of the last injurious act. <u>Id.</u> at 90.

The Middle District of North Carolina held similarly upon a Title IX discrimination claim in <u>Oldham</u>, 2023 WL 3984031, at *9–10. In that case, the plaintiff alleged that the statute of limitations on her Title IX claim did not begin to accrue until she discovered a "smoking gun" confirming the university's discriminatory intent. <u>Id.</u> at *9. Accordingly, the plaintiff argued, the relevant limitations period did not begin to run until she possessed more than "isolated facts" and "suspicions" to confirm that she experienced discrimination. <u>Id.</u> The court rejected that argument, holding that "accrual does not depend on when a plaintiff has better evidence or a 'smoking gun[.]'" <u>Id.</u> at *12. All that is necessary is that a plaintiff have "knowledge of the fact of injury and who caused it" to put the plaintiff on inquiry notice, which starts the accrual clock as to any

colorable claims that reasonable inquiry would have revealed. Id. Thus, the court concluded that once the university failed to hire the plaintiff, she was aware of those critical facts, so the Oldham plaintiff was on inquiry notice as to the discrimination claims as well, even if she did not know at the time of the employment decision that it was motivated by discrimination. Id. at *12.

Similarly, because Locke was aware in 2017 of his injury and its perpetrator—alleged inappropriate conduct by Murphy—the clock had begun to run at that time on his claims against NC State under Title IX and Section 1983. The circumstances in this case closely resemble those in Hamilton and Oldham. Locke argues that although the alleged sex discrimination occurred no later than 2017, he was unaware of facts that would have revealed his Title IX Claim and Section 1983 Claim until 2022 and 2025. However, in 2017, Locke was aware that he had been injured and that Murphy had caused the injury. Locke was on inquiry notice to investigate and find any colorable claims that might have existed against NC State. Accordingly, Locke's claims against NC State are untimely.

## II.    LOCKE'S CLAIMS AGAINST NC STATE UNDER 42 U.S.C. § 1983 SHOULD BE DISMISSED

Even if Locke's claims were timely, his Section 1983 claim is barred by the doctrine of sovereign immunity. Under his Section 1983 Claim, Locke seeks monetary damages from NC State. (See Am. Compl. ¶ 132.) However, sovereign immunity bars such a claim. The Eleventh Amendment prohibits actions in federal court by individuals against a state unless the state has consented to suit or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity. Ballenger v. Owens, 352 F.3d 842, 844–45 (4th Cir. 2003). The doctrine of sovereign immunity under the Eleventh Amendment applies to actions in which the State is a named defendant and actions against its departments, institutions, and agencies. Huang, 902 F.2d at 1138 ("[T]he Eleventh Amendment bars a suit by private parties to recover money damages from the

10

state or its alter egos acting in their official capacities."); <u>Doe v. Univ. of N.C. Sys.</u>, 133 F.4th 305, 314–15 (4th Cir. 2025) (applying <u>Huang</u> and holding that the University of North Carolina System constituent institutions, including NC State, are arms of the state entitled to sovereign immunity).

> The doctrine of sovereign immunity protects the state from suit unless it has expressly consented. <u>Guthrie v. N.C. State Ports Auth.</u>, 307 N.C. 522, 535 (1983). "It has long been established that an action cannot be maintained against the State of North Carolina or <u>an agency thereof</u>[2] unless it consents to be sued or upon its waiver of immunity, and that <u>this immunity is absolute and unqualified</u>." <u>Id.</u> at 534 (emphasis [in] original)

<u>Miller v. N.C. State Univ.</u>, No. 18-CV-523, 2019 WL 3686592, at *2 (E.D.N.C. Aug. 6, 2019) (claims against NC State dismissed with prejudice on sovereign immunity grounds). The Eleventh Amendment immunity protection extends to NC State as an alter ego of the State. <u>Id.</u>; <u>see also</u> <u>Kirby v. N.C. State. Univ.</u>, No. 13-CV-850, 2015 WL 1036946, at *6 (E.D.N.C. Mar. 10, 2015) (dismissing §§ 1983 and 1985 claims against NC State under the Eleventh Amendment); <u>Al-Deen v. Trs. of Univ. of N.C. Wilmington</u>, 102 F. Supp. 3d 758, 764 (E.D.N.C. 2015) (dismissing § 1983 claims against the board of trustees and other defendants named in their official capacities). "Congress has not imposed § 1983 liability upon states, and 'North Carolina has done nothing to waive its immunity.'" <u>Id.</u> (quoting <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989)). Thus, sovereign immunity bars Locke's Section 1983 Claim against NC State, and the claim should be dismissed.

---

2 Section 116-3 of the General Statutes creates the University of North Carolina System, which is composed of 17 constituent institutions—including NC State. N.C. Gen. Stat. § 116-4. These constituent institutions are instrumentalities or agencies of the State entitled to sovereign immunity. <u>See, e.g.</u>, <u>Bd. of Governors v. U.S. Dep't of Labor</u>, 917 F.2d 812, 816 (4th Cir. 1990); <u>Huang</u>, 902 F.2d at 1139 n.6; <u>Holmes v. Univ. of N.C.</u>, No. 18-CV-150, 2019 WL 1968045, at *4 (E.D.N.C. May 2, 2019).

In addition, Locke's Section 1983 Claim should be dismissed as futile because damages cannot be recovered from NC State, as it is not a "person" that may be sued for damages under 42 U.S.C. § 1983. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); see also DeCecco v. Univ. of S.C., 918 F. Supp. 2d 471, 497 (D.S.C. 2013) ("[State university] is entitled to dismissal of the Section 1983 claim both under the Eleventh Amendment and because it is not a 'person' subject to suit for damages under the statute.").

Thus, even if Locke's allegations in his Section 1983 Claim are taken as true, he is legally barred from recovering the damages he seeks against NC State under that claim. Therefore, the Section 1983 Claims should be dismissed as futile. See Sellers ex rel. Sellers v. Sch. Bd. of Manassas, 141 F.3d 524, 528 (4th Cir. 1998) (affirming dismissal of unrelated statutory cause of action because requested damages were unavailable under statute); see also Prentice v. Bureau of Prisons, No. 2015 WL 4928953, at *4 (E.D.N.C. Aug. 18, 2015) (dismissing habeas corpus petition to the extent it sought damages as petitioner could not legally recover them).

III.  **LOCKE FAILS TO STATE A CLAIM UNDER 42 U.S.C. § 1983 FOR FAILURE TO TRAIN**

Even if Locke's Section 1983 Claim were timely and could be brought against NC State, his claim should still be dismissed because he has failed to sufficiently state a claim for failure to train. "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." City of Canton v. Harris, 489 U.S. 378, 387 (1989). "In the school context, the failure to train must amount to deliberate indifference to the rights of students, and the deficiency in training 'must be closely related to the ultimate injury.'" Doe ex rel. Watson v. Russell Cnty. Sch. Bd., 292 F. Supp. 3d 690, 710 (W.D. Va. 2018). "Where a plaintiff claims that the [governmental body] has not directly inflicted an injury, but nonetheless has caused an

12

employee to do so, rigorous standards of culpability and causation must be applied to ensure that the [governmental body] is not held liable solely for the actions of its employee." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 405 (1997).

To that end, the deliberate indifference necessary to support a failure to train claim can be shown if an institution "know[s] or should know" that a certain approach "has failed to prevent tortious conduct by employees" in the past, yet the institution fails to make any changes to prevent said tortious conduct. Id. at 407. But without notice that a training program is deficient in a particular respect, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick v. Thompson, 563 U.S. 51, 62 (2011). Notice is established from a "showing that the need for the training and the risks of not providing the training were obvious." Russell Cnty. Sch. Bd., 292 F. Supp. 3d at 711. Failure to take action in light of this obvious need can support a failure to train claim under 42 U.S.C. § 1983. The Supreme Court has stated that such deliberate indifference can exist if an institution fails to train its employees on the constitutional limits of the powers they exercise or if constitutional violations are so prevalent that it is plainly obvious that further training is required. See City of Canton, 489 U.S. at 390 n.10.

Here, Locke fails to make any allegation that NC State was on notice of the inadequacy of its training programs. He alleges only that NC State failed to properly or sufficiently train "its administrators, staff, students, and parents about: sex discrimination and sexual harassment against students; Title IX and/or employee-against-student sexual misconduct; identifying, investigating, reporting, and remedying the effects of sexual harassment by employees . . . ; or, properly responding to and remediating continued harassment and assault by employees[.]" (Am. Compl. ¶ 125.) However, Locke does not allege that NC State was on notice as to any deficiency in its

training programs, much less that the need for further training and the risks of not providing it were obvious. Further, Locke does not allege that any inadequacy was "so likely to result in the violation of constitutional rights[,]" City of Canton, 489 U.S at 390, that NC State could be said to have been deliberately indifferent to the obvious need. The key inquiry under the Section 1983 Claim is not whether NC State was deliberately indifferent to Murphy's conduct, but whether it was deliberately indifferent to the need to provide better training. The Amended Complaint offers no allegations in this regard, and Locke's allegations of Yow, Lipitz, Clinkscales, Harrison, and Murphy's responsibilities and knowledge are insufficient to allege deliberate indifference to an obvious need for further training. Without these allegations, Locke's Section 1983 Claim fails.

The only allegations Locke makes as to any obvious deficiency in NC State's training programs are legal conclusions. Locke summarily alleges that the deficiencies in NC State's training programs were obvious and that its inadequate training failed to "prohibit or discourage foreseen conduct." (Am. Compl. ¶ 126); Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017) ("[L]egal conclusions pleaded as factual allegations, 'unwarranted inferences,' 'unreasonable conclusions,' and 'naked assertions devoid of further factual enhancement' are not entitled to the presumption of truth." (quoting SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015))).

Importantly, a training program is not obviously deficient simply because it fails to prevent misconduct. See Doe v. Rockingham Cnty. Sch. Bd., No. 2025 WL 692363, at *13 (W.D. Va. Mar. 4, 2025) (holding that even if training programs fail to prevent misconduct, good faith efforts to regularly train employees are readily distinguishable from obviously defective programs that create failure-to-train liability). Locke's simple reliance on conclusory allegations as to the problems with NC State's training initiatives, without alleging their nature and extent, is

14

insufficient to survive a motion to dismiss.  Accordingly, Locke's Section 1983 Claim should be dismissed.

## IV. LOCKE FAILS TO STATE A CLAIM UNDER TITLE IX FOR HOSTILE EDUCATIONAL ENVIRONMENT AND PRE-REPORT DELIBERATE INDIFFERENCE

Separately from and in addition to Locke's Title IX Claim being untimely, based on the allegations in the Amended Complaint as pleaded, he fails to state a claim upon which relief may be granted under either of his Title IX theories.  Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "[S]exual harassment can constitute discrimination on the basis of sex under Title IX." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 283 (1998). In this regard, our Supreme Court has recognized a narrow private cause of action under Title IX for a student of a covered educational institution who has been sexually harassed by an employee or another student of the institution. See id. at 274; Davis ex rel. Lashonda v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999). As the Fourth Circuit has explained,

> [t]o establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007).  Under this standard, Locke fails to state a claim under Title IX.

"An institution can be held liable for a Title IX violation only if 'an official . . . who has authority to address the alleged discrimination and to institute corrective measures . . . has actual

knowledge of discrimination in the [institution's] programs and fails to adequately respond' or displays 'deliberate indifference' to discrimination." Jennings, 482 F.3d at 700 (alteration and omissions in original) (quoting Gebser, 524 U.S. at 290). Locke's Amended Complaint fails to allege that NC State officials with authority to address the alleged discrimination had actual notice of Murphy's misconduct. The Fourth Circuit has previously adopted the standard that "Title IX liability may be imposed only upon a showing that . . . officials possessed actual knowledge of the discriminatory conduct in question." Baynard v. Malone, 268 F.3d 228, 238 (4th Cir. 2001). Furthermore, "to be liable under Title IX, an appropriate school official must be 'advised of' the alleged misconduct." Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 266 (4th Cir. 2021) (second emphasis in original) (quoting Gebser, 524 U.S. at 290). As explained in Fairfax County, "actual notice of [sexual] harassment for Title IX purposes" requires that "a school official with authority to address complaints of sexual harassment and to institute corrective measures receives a report[.]" Id. at 265.

As a threshold matter, Locke's allegations that a certain employee had knowledge regarding Murphy's alleged conduct are insufficient to impute knowledge of harassment to NC State. In particular, Locke alleges in conclusory fashion that, in 2014, Lipitz was informed of complaints of harassment and "was told Murphy made a male student-athlete uncomfortable[,]" (Am. Compl. ¶¶ 33, 90(a)); that in 2015, "Yow was told that Murphy was making male student-athletes uncomfortable[,]" (id. ¶¶ 34, 90(b); and that, in 2019, Harrison was aware of certain "performance and conduct issues with Murphy[,]"[3] (id. ¶ 90(i)).

---

[3] Separately, this allegation is irrelevant as to Locke's claims, as Harrison allegedly acquired this knowledge two years after Locke transferred schools.

16

None of these isolated allegations is sufficient to put these officials on notice that sexual harassment had occurred. These allegations of harassment are insufficient to show that NC State had "actual knowledge" that Murphy had harassed students. "[M]ere allegations, or risks, or rumors of sexual harassment are insufficient for liability." Rector v. Burnette, No. 24-CV-245, 2024 WL 4876143, at *2 (W.D.N.C. Nov. 22, 2024); Davis, 526 U.S. at 642 (Title IX liability only lies where the institution remained "deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge" and not for "harassment of which it knew or should have known" (emphasis added)); see also Fairfax Cnty. Sch. Bd., 1 F.4th at 276 n.15 (holding that single, isolated incidents generally do not provide a basis for Title IX liability unless they are "extremely serious").

The Amended Complaint also alleges that in February 2016, the head coach of the men's soccer team informed Defendant Clinkscales that Murphy was engaging in "grooming" behavior and told both Clinkscales and Harrison of "concerns about Murphy's sexually inappropriate conduct." (Am. Compl. ¶¶ 84(a), 90(c).) Setting aside the substance of this report and its sufficiency to serve as actual notice of harassment, the actual notice must be provided to an "appropriate person" in order to survive dismissal. These requirements are independently dispositive on a Title IX claim; that is, without both (i) a sufficient allegation (ii) made to an "appropriate person," Plaintiff's claim fails.

While the Fourth Circuit has found that allegations of suspicions of conduct consistent with "grooming" satisfy the sufficient allegation requirement, Doe v. N.C. State Univ., 125 F.4th 498, 503–07 (4th Cir. 2025), it specifically left open the question of whether Clinkscales and Harrison may be considered "appropriate persons" for Title IX purposes. See id. at 507 ("[F]or the university to have actual notice, the report of Murphy's sexual grooming must have reached an

appropriate official. . . . [W]e remand the case to the district court to decide this issue."). Locke's Amended Complaint does not adequately allege that Clinkscales or Harrison were "appropriate persons."

The Amended Complaint alleges that Clinkscales and Harrison, during their respective tenures, were Murphy's direct supervisors and managers, that they had the authority to conduct employee reviews for Murphy, and that they could assign and/or change Murphy's duties. (Am. Compl. ¶¶ 16–17.) The Amended Complaint also states that they were both "designated as an [NC State] responsible employee." (Id.) A "responsible employee," as alleged by the Amended Complaint, is a university official who had "a duty to report incidents of sex discrimination to the Title IX Coordinator or other appropriate Title IX designee." (Id. ¶ 14 n.1.) This allegation offers no insight as to whether "responsible employees" may take corrective actions on behalf of NC State.[4] Without this crucial allegation, Plaintiff has not alleged that a "responsible employee" is an "appropriate person" under Title IX to impute knowledge of harassment to NC State.

The Amended Complaint summarily concludes that Clinkscales and Harrison could "take corrective actions when needs were identified based on Murphy's performance and conduct." (Am. Compl. ¶ 16.) However, it does not allege that either of them possessed any power to institute corrective actions as required by an "appropriate person"; it does not allege that Clinkscales or Harrison had the authority to hire a new athletic trainer, fire Murphy, or suspend Murphy for misconduct. See Baynard, 268 F.3d at 238–39 (holding that despite principal's possession of responsibility to supervise other employees, evaluate their performance, and recommend discipline, he was not an "appropriate person" for Title IX purposes because he did

---

[4] Indeed, the requirement that a responsible person must report incidents to others with more authority suggests that the power lies with the person to whom the incidents are reported.

not have the power to "hire, fire, or suspend"). As alleged, neither Clinkscales nor Harrison had any hiring or firing authority, nor could they suspend Murphy if needed.

The Fourth Circuit found the lack of these powers to be dispositive in <u>Baynard</u>. 268 F.3d at 239. In that case, a principal possessed supervisory authority over teachers and was responsible for administration of the school; in addition, she could evaluate employee performance and recommend that certain individuals be hired, fired, or transferred. <u>Id.</u> However, because the principal did not possess the "traditional powers of an employer[,]" defined as the authority to hire and terminate employees, the Fourth Circuit held she could not be considered an appropriate person whose knowledge of misconduct could impute Title IX liability to the school board. <u>Id.</u> Like the principal in <u>Baynard</u>, all of Clinkscales and Harrison's alleged supervisory authority over Murphy is still insufficient to make either of them an "appropriate person" with the power to take corrective action once informed of a Title IX violation. 268 F.3d at 239. Therefore, Clinkscales and Harrison's alleged knowledge gained from Findley in 2016 cannot be used to support the contention that NC State had knowledge of Murphy's alleged conduct.

Because Locke fails to allege that actual notice of Murphy's misconduct was given to an appropriate official, Locke has not sufficiently alleged that NC State had actual knowledge of the alleged misconduct. Therefore, Locke's Title IX Claim against NC State should be dismissed.

<u>**CONCLUSION**</u>

For the foregoing reasons, NC State respectfully requests that this Court grant its Motion and dismiss it from this action with prejudice.

Respectfully submitted, this the 29th day of August, 2025.

**ELLIS & WINTERS LLP**

/s/ Alex J. Hagan
Alex J. Hagan
N.C. Bar No. 19037
Chelsea Pieroni
N.C. Bar No. 59816
Post Office Box 33550
Raleigh, NC 27636
Tel: (919) 865-7000
Fax: (919) 865-7010
alex.hagan@elliswinters.com
chelsea.pieroni@elliswinters.com

Dixie T. Wells
N.C. Bar No. 26816
Ellis & Winters LLP
Post Office Box 2752
Greensboro, NC 27402
Tel: (336) 217-4193
Fax: (336) 217-4198
dixie.wells@elliswinters.com

Counsel for Defendant North Carolina State
University

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that this brief complies with the word limit requirements of Local Civil Rule 7.2(f)(3)(A) of the United States District Court for the Eastern District of North Carolina. In making this certification, the undersigned certifies that the above brief contains 6081 words, as reported by the word count feature of word processing software.

This the 29th day of August, 2025.

/s/ Alex J. Hagan
Alex J. Hagan